IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 3:23CR62TSL-LGI
    CRIMINAL NO. 3:23CR63TSL-LGI

DANIEL READY OPDYKE

### SENTENCING MEMORANDUM

The United States of America, by and through its counsel of record, the United States Attorney's Office for the Southern District of Mississippi and the Civil Rights Division of the Department of Justice ("the United States"), files this sentencing memorandum to assist the Court with sentencing Defendant Daniel Opdyke in the above-captioned cases at his consolidated sentencing hearing, which is scheduled for March 20, 2024. The United States respectfully submits that a sentence at the high end of Defendant Opdyke's Guidelines range is sufficient, but not greater than necessary, to comply with the purposes of sentencing, 18 U.S.C. § 3553(a), because it would account for (1) the egregiousness of Defendant Opdyke's conduct; (2) the seriousness of civil rights crimes and the damage they cause to society; and (3) the special need for general deterrence in this context.

**I.    Factual and Procedural History**

    **a.    Criminal No. 3:23-cr-00062-TSL-LGI (Conerly Road)**

On January 24, 2023, Defendant Daniel Opdyke and his five co-defendants in Criminal No. 3:23-cr-00062-TSL-LGI ("the Conerly Road incident"), while acting as sworn law enforcement officers, unlawfully entered the home of M.J. and E.P. without a warrant, handcuffed

and arrested them without probable cause to believe they had committed a crime, and, over the course of the next hour, tased them dozens of times, taunted them with racial slurs, threw eggs at them, waterboarded them, assaulted them with a dildo, and placed guns to their heads.  The ordeal culminated with a mock execution: Co-Defendant Elward surreptitiously ejected a bullet from the chamber of his gun, and then shoved his gun in M.J.'s mouth and dry-fired it.  The gun clicked but did not discharge.  Co-Defendant Elward removed the gun from M.J.'s mouth and instinctively but subconsciously clicked the magazine back into place.  Co-Defendant Elward then placed the gun back in M.J.'s mouth and pulled the trigger, and the gun discharged.  The bullet blew apart M.J.'s tongue, shattered his jaw, and exited through his neck.  As M.J. lay bleeding on the floor, Defendant Opdyke and his co-defendants devised a false cover story and took steps to corroborate it, including: removing M.J.'s handcuffs, planting a BB gun next to him, destroying surveillance video, getting rid of spent shell casings and taser cartridges, submitting fraudulent drug evidence to the crime lab, filing false reports, charging the victims with crimes they did not commit, and making false statements to investigators.

In connection with that incident, Defendant Opdyke was charged in an Information with eight felony offenses: Conspiracy Against Rights, in violation of 18 U.S.C. § 241 (Count 1); Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242 (Counts 2, 3, 6, 8, and 10); Conspiracy to Obstruct Justice, in violation of 18 U.S.C. § 1512(k) (Count 11); and Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(3) (Count 12).  ECF 3.  The parties subsequently entered into a plea agreement, ECF 60.

b.     **Criminal No. 3:23-cr-00063-TSL-LGI (Interstate 20)**

On December 4, 2022, Defendant Opdyke and his two co-defendants in Criminal No. 3:23-cr-00063-TSL-LGI ("the I-20 incident"), while acting as sworn law enforcement officers, violated A.S.'s right to be free from excessive force.  Co-Defendant Dedmon learned that A.S. had allegedly stolen personal property from Dedmon's neighbor.  Co-Defendant Dedmon asked other RCSO deputies to conduct a traffic stop and detain A.S. until Dedmon could arrive.  Co-Defendant Hunter Elward and Defendant Daniel Opdyke arrived separately after the traffic stop and continued to detain A.S. while waiting for Co-Defendant Dedmon.  Co-Defendant Dedmon then arrived, at which time he threw A.S. to the ground and slapped, punched, and kicked him, even though A.S. was not resisting.  Co-Defendant Dedmon then took Opdyke's service weapon and fired it multiple times near A.S. to coerce him to confess to stealing the property.  Co-Defendant Dedmon tased A.S. repeatedly, and then pulled out his penis and rubbed it on A.S.'s face.  Defendant Opdyke, along with Co-Defendant Elward, failed to intervene to protect A.S., despite the opportunity to do so.

In connection with that incident, Defendant Opdyke was charged in an Information with one felony offense: Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242 (Count 1).   The parties subsequently entered into a plea agreement. ECF 36.

c.     **Guilty Pleas and Sentencing Date**

On August 3, 2023, Defendant Opdyke pleaded guilty to the charged crimes in both cases, and the Court accepted his guilty pleas.  The Court set a consolidated sentencing date of January 18, 2024, which was later continued to March 20, 2024.

## II.     Sentencing Factors

### A.     Sentencing Factors

Section 3553(a) of Title 18 identifies sentencing factors for district courts to consider in imposing sentencing in a criminal case. A court "in determining the particular sentence to be imposed, shall consider," among other factors, "the nature and circumstances of the offense," "the history and characteristics of the defendant," and the purposes of sentencing: specifically, "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, [] to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B)-(C). After weighing those factors, the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

### B.     Application of Sentencing Factors and Sentencing Recommendation

The United States respectfully submits that a sentence at the high end of Defendant Opdyke's Guidelines range is sufficient, but not greater than necessary, to comply with the purposes of sentencing, 18 U.S.C. § 3553(a), because it would appropriately account for (1) the egregiousness of Defendant Opdyke's conduct; (2) the seriousness of civil rights crimes and the damage they cause to society; and (3) the special need for general deterrence in this context.

First, a high-end Guidelines sentence would appropriately account for the nature and circumstances of the crimes at Conerly Road, and, in particular, the aggravating factors that make Defendant Opdyke's conduct egregious:

- <u>Premeditation</u>. Defendant Opdyke planned to use excessive force on January 24, 2023, and he was aware that the other officers also planned to use excessive force. Opdyke was part of the off-the-books text thread in which Co-Defendant Dedmon asked if Co-Defendant Middleton, Co-Defendant Elward, and Opdyke were available

for a "mission" at Conerly Road, and in which Dedmon warned against surveillance and "bad mugshots." Opdyke understood he had a green light to use excessive force so long as it would not be captured by a mugshot. Opdyke's knowledge and premeditated plan to use excessive force is an aggravating factor the Court should consider at sentencing. *See Tison v. Arizona*, 481 U.S. 137, 156 (1987) ("Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished."); *United States v. Livoti*, 196 F.3d 322, 328-29 (2d Cir. 1999) (holding the district court properly found that the defendant-officer's conduct "fell outside the 'heartland' of typical civil rights cases" and justified a departure in part because the defendant-officer "had himself created the violent situation which led to Baez's death because the Baez brothers had done nothing wrong and [the defendant-officer] lacked probable cause to arrest them.").

- Racial animus. Inside 135 Conerly Road, the defendants, all of whom are white, violently assaulted M.J. and E.P., both of whom are Black. During the assault, the defendants called M.J. and E.P. racial slurs, including, "nigger," "monkey," and "boy"; accused them of taking advantage of the white woman who owned the house; and warned them to stay out of Rankin County and go back to Jackson or to "their side" of the Pearl River—areas with higher concentrations of Black residents. The defendants' insidious racial animus is an aggravating factor the Court should consider in imposing sentence. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) ("Traditionally, sentencing judges have considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant. … The defendant's motive for committing the offense is one important factor.").

- Brutality. The defendants' assault on M.J. and E.P. was particularly brutal. The victims endured multiple forms of torture and humiliation over a prolonged period. They were handcuffed, tased repeatedly, hit, kicked, beaten with objects, waterboarded with various liquids, sexually assaulted with a dildo and threatened with rape, intimidated with multiple gunshots, and, ultimately, Defendant Elward discharged his gun inside M.J.'s mouth. Opdyke's overall participation in the prolonged brutality, as well as his personal actions during the abuse—including kicking E.P., forcing a dildo into E.P.'s mouth, and trying to force the dildo in M.J.'s mouth—are aggravating factors the Court should consider in imposing sentence. *See, e.g.*, *United States v. Lozoya*, 623 F.3d 624, 626 (8th Cir. 2010) (stating that it was proper for the district court to consider the "brutal nature of the attack" in gang-related prison assault); *United States v. Carroll*, 189 F. App'x 450, 457 (6th Cir. 2006) (rejecting the defendant-officer's substantive reasonableness challenge and noting that, "This was an ugly episode, the violence gratuitous, calculated, malicious and sustained, and defendant Carroll was one of five active participants.").

- Severity of victims' injuries and emotional trauma. M.J. and E.P. both experienced severe pain from the torture they endured. M.J. suffered permanent injury. As noted above, the bullet from Co-Defendant Elward's gun blew apart M.J.'s tongue, shattered his jaw, and exited through his neck. M.J. required emergency surgery, his jaw had to

be wired shut, and he spent five days in the intensive care unit and 21 total days in the hospital as a result of the shooting. To this day, M.J. has not fully recovered. He still experiences constant pain from being shot. It is painful for him to eat and drink, and he has persisting problems with his jaw. In addition, the injury has affected his eyesight and his ability to sing, both of which prevent him from being the musician he once was.

The injury to M.J. and E.P. is not only physical. Both men have lasting and profound emotional trauma. M.J. feels broken and struggles with shame, nightmares, and anxiety. E.P has similarly struggled with lasting emotional trauma. He is terrified of the public, lives in constant fear of further terrorization, and states the humiliation from the sexual assault is too great for him to talk about. The victims' serious physical injuries and continuing emotional trauma are aggravating factors the Court should consider in imposing sentence. *See United States v. Bailey*, 169 F. App'x 815, 826 (5th Cir. 2006) (upholding district court's upward departure based in part on the "severity of the injuries" to the victims); *United States v. Dautovic*, 763 F.3d 927, 935 (8th Cir. 2014) (noting that the defendant-officer's "infliction of serious injury" and "physical restraint" of the victim were "aggravating circumstances" the district court should have considered at sentencing).

- <u>Nature and extent of cover up</u>. After Co-Defendant Elward shot M.J. at Conerly Road, the defendants left M.J. bleeding on the floor while they huddled together on the property's back porch, where they agreed to tell investigators an elaborate cover story. To support their cover story, the defendants destroyed evidence, planted evidence, tampered with witnesses, filed serious false charges against M.J. supported by false evidence, wrote false reports, and lied to investigators. Opdyke's role in the overall cover up, as well as his personal actions in service of the concocted cover story—including tampering with evidence by disposing of a shell casing—are aggravating factors the Court should consider in imposing sentence. *Dautovic*, 763 F.3d at 935 (noting that the defendant-officer "tried to conceal his wrongdoing by falsifying a police report and lying under oath," which was an aggravating circumstance of the offense); *United States v. Cordero*, 609 F. App'x 73, 78 (3d Cir. 2015) (affirming officer's 120-month sentence for obstruction of justice, and explaining that upward variance was justified because "not only did he defy the law he was sworn to protect, but he abused the privileges of his law enforcement position to subvert and frustrate a federal investigation.").

A sentence at the high end of Defendant Opdyke's Guidelines range is appropriate given these aggravating factors.

Second, a high-end Guidelines sentence would appropriately account for the seriousness of civil rights crimes and the damage they cause to society. "The seriousness of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness

themselves." *United States v. Boone*, 110 F. Supp. 3d 909, 917 (S.D. Iowa 2015), *aff'd* 828 F.3d 705 (8th Cir. 2015). As the Supreme Court has emphasized, "[p]ublic officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold." *Koon v. United States*, 518 U.S. 81 (1996). Civil rights crimes erode the public's trust in fair and evenhanded law enforcement, thereby weakening the social contract that bonds our society together and leading to social unrest. *United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711941, at *50 (D.N.M. Feb. 5, 2015) ("A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation. Civil rights crimes go to the core of our system and endanger the entire structure of our government and are a threat to the republic."). If civil rights crimes are not taken seriously and punished appropriately, disproportionally affected groups are left with the impression that their rights do not matter and that law enforcement officers will continue to violate them with impunity.

Third, a high-end Guidelines sentence would appropriately reflect that the need for "general deterrence is especially compelling in the context of officials abusing their power." *United States v. Hooper*, 566 F. App'x 771, 773 (11th Cir. 2014) (unpublished). That is because "violent abuse" by law enforcement officers "may easily go undetected and unpunished," so in the rare instance that it is ferreted out, the interest in general deterrence requires that a strong message be sent to would-be violators. *United States v. McQueen*, 727 F.3d 1144, 1158–59 (11th Cir. 2013) (emphasizing that "[t]he ability to unearth these crimes by law enforcement officers . . . is particularly difficult, and, as we see it, the extraordinarily lenient sentences in this case sap the goal of general deterrence."); *see also Hooper*, 566 F. App'x at 773 (reversing district court's downward variance in part because it failed to factor in "the need for [the defendant's] sentence to adequately deter other police officers from using excessive force."); *United States v. Ronda*, 455

F.3d 1273, 1302 (11th Cir. 2006) ("[T]he sentences imposed should serve to deter against future criminal activity by these defendants as well as by others similarly situated who may be tempted to violate the law and their oath of office to protect themselves or their fellow officers from possible state or federal criminal investigations."); *United States v. Pendergrass*, 648 F. App'x 29, 36 (2d Cir. 2016) (unpublished) (affirming district court's judgment that "a substantial sentence was warranted for deterrence purposes, given that 'civil rights cases like this one are difficult to investigate and to prosecute' and it is important 'to let it be known that such criminal indifference and cruelty will not be tolerated.'").  As one court put it, "[e]ven if [the defendant-officer] will likely never violate another person's constitutional rights, a serious sentence sends a message to all law enforcement officers to not abuse their positions."  *Rodella*, 2015 WL 711941, at *51.  A high-end Guidelines sentence in this case would send a strong message to rogue officers that if they abuse their authority and obstruct justice to cover it up, they will not receive special treatment or get away with a slap on the wrist.

### III. Conclusion

For the foregoing reasons, the United States respectfully submits that a sentence at the high end of Defendant Opdyke's Guidelines range provides adequate and appropriate punishment in this case, is consistent with the Sentencing Guidelines, and accounts for all relevant 18 U.S.C. § 3553(a) factors.

Respectfully submitted this 4th day of March 2024.

| | |
|---|---|
| KRISTEN M. CLARKE<br>Assistant Attorney General<br>Civil Rights Division | TODD W. GEE<br>United States Attorney<br>Southern District of Mississippi |

BY:  *s/Christopher J. Perras*  
Christopher J. Perras (MASS # 682002)  
Special Litigation Counsel  
Criminal Section, Civil Rights Division  
DOJ 4CON, 150 M Street, NE  
Washington, DC 20002  

BY:  *s/Erin O. Chalk*  
Erin O. Chalk (MSB # 101721)  
Criminal Chief  
United States Attorney's Office  
501 East Court Street  
Jackson, Mississippi 39201  

BY:  *s/Daniel Grunert*  
Daniel Grunert (D.C. Bar # 1721133)  
Trial Attorney  
Criminal Section, Civil Rights Division  
DOJ 4CON, 150 M Street, NE  
Washington, DC 20002  

BY:  *s/Glenda Haynes*  
Glenda Haynes (MSB # 2132)  
Assistant United States Attorney  
United States Attorney's Office  
501 East Court Street  
Jackson, Mississippi 39201

**CERTIFICATE OF SERVICE**

    I, Erin O. Chalk, Assistant U. S. Attorney, do hereby certify that I have filed the foregoing **SENTENCING MEMORANDUM** with the Clerk of the Court, using the electronic filing system, ECF, which sent notification to the following participants: Jason M. Kirschberg and Jeffery P. Reynolds, attorneys for Defendant Daniel Opdyke, and to James Tucker, United States Probation Officer.

    Respectfully submitted this 4th day of March 2024.

*S/ Erin O. Chalk*
ERIN O. CHALK
Assistant U. S. Attorney